

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

ENTERED
04/23/2009

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 08-30974-H4-13 |
| **THEODORE HARYDZAK, JR. and** | § | |
| **JO LANE HARYDZAK,** | § | |
| | § | |
| Debtors. | § | |

| | | |
|---|---|---|
| **THEODORE HARYDZAK, JR. and** | § | |
| **JO LANE HARYDZAK,** | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | Adversary No. 08-03061 |
| **NEW HORIZON, LLC;** | § | |
| **1211 KAPPA STREET TRUST; and** | § | |
| **FIRST BANK OF CONROE, N.A.,** | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM OPINION ON PLAINTIFFS' ORIGINAL COMPLAINT
[Docket No. 1][1]

### I. INTRODUCTION

Hard times generate scam artists. Particularly with respect to homesteads, these unscrupulous individuals prey upon the homeowners' fears of losing their major asset: the house which gives shelter to their children. In both *Cadengo*[2] and the suit at bar, certain unprincipled persons

---

[1] Any reference to a "Docket No." in these findings of fact and conclusions of law is a reference to a docket number in the adversary proceeding number 08-3061.

[2] *Cadengo v. Consolidated Fund Mgmt, LLC, et al., (In re Cadengo)*, 370 B.R. 681 (Bankr. S.D. Tex. 2007). In *Cadengo*, the debtor's father attempted to obtain a home equity loan in order to acquire the funds necessary to bring his new wife to the United States. The father and daughter in that case unwittingly and hastily signed documents prepared by a lender's shady business associate. What the borrowers in *Cadengo* did not know—due in part to their limited comprehension of the English language—was that they had unwittingly signed documents that purported to sell the homestead from the father to the daughter in an beguiling transaction that netted the lender's business associate $5,000.00. *Id.* at 685-89.

flimflammed honest, hard-working people who were desperate to keep their home and who trusted these individuals to help them achieve this objective. When these scheming people eventually skipped town, they left the homeowners in harm's way with their respective lenders breathing down their neck. Unfortunately for the lenders, their own sloppiness and willingness to do business with scam artists leave them bearing the ultimate loss. It is the cost of doing business with unsavory individuals.

In this adversary proceeding, the plaintiffs, Theodore Harydzak, Jr. and Jo Lane Harydzak (the Harydzaks), allege that First Bank of Conroe, N.A. (the Bank) has no lien on their homestead. More specifically, the Harydzaks seek a declaration that the Bank is not a bona fide lender for value[3] because, among other things, the Harydzaks' continued occupation of the residence and the unusual nature of the real estate transactions prior to closing should have caused the Bank to inquire further into this loan transaction; and had the Bank inquired further, it would have discovered that the Harydzaks held title to homestead property on which the Bank was about to take a non-purchase money lien. [Docket No. 1.] The Bank argues that it is a bona fide lender for value, and, therefore, that its lien on the Harydzaks' homestead is valid. In essence, this particular suit is a trespass to try title action brought to determine which party has superior title to a piece of real property.

The Court makes the following findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014. To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such. Moreover, to the extent that any conclusion of law is

---

[3] The term "bona fide *purchaser* for value" may logically be replaced with "bona fide *lender* for value" because here, the Bank was lending money, not purchasing property. "Both terms [i.e. bona fide purchaser and bona fide mortgagee] were defined as requiring the purchaser or mortgagee to acquire its interest in the property in good faith, for value and without notice of the claim or interest of a third party." *See Houston First Am. Sav. v. Musick*, 650 S.W.2d 764, 769 (Tex. 1983) (citing *Houston Oil Co. of Tex. v. Hayden*, 135 S.W. 1149 (Tex. 1911)).

construed as a finding of fact, it is adopted as such. The Court reserves its right to make additional findings of fact and conclusions of law as it deems appropriate or as may be requested by any of the parties.

## II. FINDINGS OF FACT

1.    The Harydzaks are Debtors in the above-referenced Chapter 13 bankruptcy case (No. 08-30974) and have filed this adversary proceeding against New Horizon, LLC (New Horizon), the 1211 Kappa Street Trust, and the Bank (collectively, the Defendants).

2.    Since 1982, the Harydzaks have resided at 1211 Kappa Street, Pasadena, Texas 77504 in Harris County (the Property). [Plaintiffs' Ex. 56D.]  The Harydzaks have been married for approximately 28 years and have raised three children.  Mr. Harydzak served in the United States Navy where he received an honorable discharge.  He has been employed with AT&T for over 28 years where he has worked as a cable splicer for the past 13 years.  Ms. Harydzak is a homemaker.  The Harydzaks are unsophisticated individuals with respect to financial transactions.

3.    In January 2006, Regions Bank (Regions) posted the Property for a February 7, 2006 foreclosure.  Regions took this action because it held a first lien on the Property, and the Harydzaks were in default under the note held by Regions which was secured by the Property.  The Harydzaks had previously fallen into default four times, but had been able to cure the defaults.  This fifth time, however, they were unable to cure and were therefore staring foreclosure in the face.

4.    Desperate to stop this scheduled foreclosure, Ms. Harydzak took a telephone call from a Mr. Donnie Scribner who identified himself as a representative of New Horizon.  During this

telephone conversation, Mr. Scribner informed Ms. Harydzak that he could help her and that she would be receiving a follow-up phone call. She concluded that New Horizon might be able to provide the necessary refinancing to ward off the foreclosure. Indeed, she later received a phone call from Shane Perkins (Perkins), a principal of New Horizon.[4] During this phone conversation, Perkins set up a meeting at the Harydzaks' home for the purpose of—at least in Ms. Harydzaks' mind—executing documents for the refinancing. And, indeed, on February 5 or 6, 2006,[5] Ms. Harydzak, although given no time by Perkins to review documents, nevertheless signed what he put in front of her so that New Horizon would pay Regions and thereby stop the foreclosure. The specific documents that she signed were: (1) a Warranty Deed to Trustee transferring title to the Property from the Harydzaks to Debra Perkins as a trustee[6] [Plaintiffs' Ex. 5]; and (2) a Residential Lease Agreement with New Horizon. [Plaintiffs' Ex. 6.] Although Ms. Harydzak did not understand the effect of her execution of these two documents, her signing them caused title to the Property to be transferred to Debra Perkins, as trustee, and also caused Ms. Harydzak to become a

---

[4] According to testimony given by Marc A. Mercer (Mercer) at a hearing in the main case in March 2008, the two managers of New Horizon were Perkins and Mercer himself. One of the documents introduced at the trial of this adversary proceeding—the so-called "Consent by Beneficiaries" [Plaintiffs' Ex. 41]—also denotes Messrs. Perkins and Mercer as the two managers. Despite Mercer's designation as a member of New Horizon, it is clear to this Court from not only Mercer's testimony at the hearing in the main case, but more importantly from Ms. Harydzak's testimony at trial, and from certain exhibits introduced at trial, that Perkins was the sole decision-maker, and only mover and shaker, for New Horizon.

[5] The Court notes a date conflict that has no bearing on the outcome of this suit: The Warranty Deed to Trustee is dated February 5, 2006, and Ms. Harydzak testified that she did sign this document on February 5, 2006. [Plaintiffs' Ex. 5.] However, the Residential Lease Agreement is dated February 6, 2006 [Plaintiffs' Ex. 6], and Ms. Harydzak testified that she signed the Residential Lease Agreement at the same time as the Warranty Deed to Trustee.

[6] Debra Perkins is the wife of Perkins. Approximately one month later, on March 20, 2006, Debra Perkins, as trustee, signed a general warranty deed transferring title to the Property back to the Harydzaks. [Plaintiffs' Ex. 21.] This conveyance was apparently done to lead the Harydzaks into believing that they continued to own title to the Property—even though they were signing other documents conveying title to an entity known as 1211 Kappa Street Trust, which was yet another entity concocted by Perkins to fleece the Harydzaks.

"Resident" of this Property.  Indeed, that is how her status under the so-called Residential Lease Agreement was described, not as a "lessee" or "tenant."  The Residential Lease Agreement contained no reference to a "lessor" or "landlord" but rather only to a "Managing Agent"—which was New Horizon.  To characterize this document as bizarre would be an understatement.

5.        At the time Ms. Harydzak signed these documents, she had no idea about New Horizon's background.  New Horizon was the creation of Perkins.  It is clear that New Horizon was in the business, among other things, of seeking out unsophisticated homeowners who had significant equity in their homesteads but were facing foreclosure, and convincing those homeowners that New Horizon would cure the default to stop the foreclosure.  What New Horizon did not explain to these trusting homeowners was that in signing the unusual and confusing documents that Perkins put in front of them for their execution in exchange for New Horizon curing the default, they were conveying title to their homestead to New Horizon (or its designee), thereby affording New Horizon the opportunity to obtain financing itself by offering the property as collateral.

6.        On February 6, 2006, New Horizon paid a total of $7,811.83 ($6,873.83 to Regions and $938.00 to Regions's counsel) to bring the existing mortgage loan current and to avoid the foreclosure sale scheduled for the next day, February 7, 2006.

7.        On February 21, 2006, the Managers of New Horizon instructed Ms. Harydzak to sign several documents, among which included the following: (1) a Trust Agreement creating the 1211 Kappa Street Trust (the Trust) and listing the Harydzaks as the "Trustor" and the 97% "Majority Beneficiary," and New Horizon as the 3% "Minority Beneficiary" [Plaintiffs' Ex.

8]; (2) a Lease Agreement referring to the Trust as the "Owner" and the Harydzaks as "Lessees" [Plaintiffs' Ex. 9]; (3) a Promissory Note made payable to New Horizon [Plaintiffs' Ex. 15]; and (4) a Special Warranty Deed transferring title from the Harydzaks to the Trust. [Plaintiffs' Ex. 16.] With New Horizon having cured the Harydzaks' default to Regions, Ms. Harydzak trusted New Horizon and executed these documents with the honest and firm belief that she was simply refinancing the loan that her husband and she had with Regions. At the time Ms. Harydzak signed these documents on behalf of herself and her husband, Mr. Harydzak had not executed a power of attorney granting her authority to sign on his behalf. From New Horizon's standpoint, it had Ms. Harydzak execute all of these documents so as to put title to the Property in the name of the Trust—a trust which Perkins controlled. Perkins included language in all of these documents making them effective as of February 6, 2006—which was the date that Ms. Harydzak and he first met.

8. Once Perkins realized that Ms. Harydzak did not have a power of attorney from her husband, he then took steps to ensure that she obtained such a right. Thus, on March 16, 2006, Mr. Harydzak signed a Limited Power of Attorney giving his wife the authority to act on his behalf in matters pertaining to the Property. [Plaintiffs' Ex. 22.][7]   This same day, Ms. Harydzak then re-executed, for both herself and her husband, the various documents that she had executed the previous month, including, among other documents, the Trust Agreement [Plaintiffs' Ex. 23], the Lease Agreement [Plaintiffs' Ex. 31], the Promissory Note [Plaintiffs' Ex. 26], and the Special Warranty Deed [Plaintiffs' Ex. 32] transferring title to

---

[7] Mr. Harydzak testified that he did not think twice about giving his wife a power of attorney, as he had done so in the past when he was overseas. Here, because he was at work during the day, he gave his wife the power of attorney and left it up to her to execute the documents that he, too, believed represented refinancing of the Regions loan.

the Property to the Trust. [Plaintiffs' Ex. 23 through 32.] New Horizon and the Trust needed

Ms. Harydzak to sign these same documents again because on February 21, 2006, she did not

have the authority to sign on behalf of her husband; it was on March 16, 2006 that she

obtained the power of attorney from her husband. Once again, because Ms. Harydzak trusted

New Horizon, she signed all of the documents without question, and when she did, she

believed that her husband and she were simply refinancing with New Horizon. As with the

documents that Ms. Harydzak had signed on February 21, 2006, the effect of her re-executing

these documents was to put title to the Property in the name of the Trust and to have the

Trust, as landlord, lease the Property to the Harydzaks, as lessees.[8]

9.   At some point in early fall of 2006, New Horizon approached the Bank about a loan and

represented that New Horizon would provide the Property as collateral for this loan.

Subsequently, the Bank agreed to extend the financing.

10.   James E. Crow, Jr. (Crow), the President of the Bank,[9] testified at trial that the Bank relied

upon its outside counsel for the documentation evidencing the loan that the Bank made to

New Horizon. Counsel for the Bank drafted all of the loan documents for the loan to New

Horizon, and this same attorney, in drafting these documents, reviewed a variety of existing

documents, such as public records from the Harris County Clerk's Office evidencing the

---

[8] The lease agreement that Perkins had Ms. Harydzak sign on February 21, 2006, and then again on March 16, 2006 (after obtaining her husband's power of attorney), actually contained the words "landlord" and "lessee" as a normal lease agreement should. Why the lease agreement that Perkins had Ms. Harydzak execute on February 6, 2006 contained no reference to "landlord" and "lessee," but rather only to "Resident" and "Managing Agent," is unclear to this Court. Apparently, at the first meeting on February 6, 2006, Perkins—not knowing exactly how unsophisticated Ms. Harydzak was—did not want to scare off Ms. Harydzak from his scam by having her sign a document that might lead her to believe she was giving up title to the Property and becoming a mere lessee.

[9] The Montgomery Banking Center of the First Bank of Conroe is essentially a branch of the Bank. [Tape recording of the March 5 trial.] Crow has worked at the Bank for 20 years. In his position, he is responsible for making many of the loans from that branch of the Bank, including loans made in 2006.

conveyance of the Property to the Harydzaks in 1982. This same attorney was responsible

for providing loan closing instructions to the title company for the closing that took place on

November 7, 2006. One of the documents that this attorney drafted was a Consent by

Beneficiaries. On November 7, 2006, New Horizon signed this Consent by Beneficiaries but

the Harydzaks did not. [Plaintiffs' Ex. 41.]

11. On November 7, 2006, the Trust deeded the Property to New Horizon. [Plaintiffs' Ex. 42.]

12. On November 7, 2006, the Bank extended a $57,000.00 loan to New Horizon. [Plaintiffs'

Ex. 40.] New Horizon signed a promissory note for this amount, [Plaintiffs' Ex. 36], and

also executed a deed of trust on the Property to secure this obligation (the Deed of Trust).

[Plaintiffs' Ex. 37.] Although the Harydzaks were completely unaware that the Bank had

made this loan on November 7, 2006, at trial, their attorney stipulated that the Bank paid

value to obtain a security interest in the Property. Using a small portion of the loan proceeds

of $57,000.00, New Horizon then paid $4,232.62 to Regions to completely pay off the

Harydzaks' mortgage. At the time of this loan, the Harydzaks occupied the Property.

13. New Horizon and the Bank had previous business dealings wherein New Horizon had

borrowed money secured by real property New Horizon owned as rental property, and New

Horizon had repaid these loans.

14. On November 8, 2006, after the Bank already made the loan to New Horizon, the Harydzaks,

along with New Horizon, signed a Consent by Beneficiaries identical to the November 7

Consent by Beneficiaries drafted by the Bank's attorney. [Plaintiffs' Ex. 41.] The Consent

by Beneficiaries stated:

8

> The undersigned [i.e. the Harydzaks and New Horizon], being all of the beneficiaries of the 1211 Kappa Street Trust, hereby agree and consent to the execution and delivery of that certain Special Warranty Deed dated November 7, 2006, executed by 1211 Kappa Street Trust, as Grantor, and New Horizon, LLC, Grantee.

15. On December 7, 2006, New Horizon deeded the Property back to the Trust. [Plaintiffs' Ex. 43.]

16. The Harydzaks timely made monthly payments to the Trust under their lease agreement. And they did so under the belief that the Trust was making payments to New Horizon, whom they believed became their mortgagee after New Horizon made payment to Regions in February 2006. Eventually, in late 2007, the Harydzaks defaulted under the lease agreement.

17. On January 8, 2008, Ms. Harydzak was served with a three-day notice to vacate the Property. Neither she, nor her husband and their children, vacated the Property.

18. On January 17, 2008, the Trust filed an eviction suit with the Justice Court of Precinct 8, Place 1 of Harris County, Texas. Ms. Harydzak represented her husband and herself *pro se*, and, not surprisingly, did not fare well.

19. On January 30, 2008, the Justice of the Peace Court for Precinct 8, Place 1, Harris County, Texas signed a judgment awarding possession of the Property to the Trust (the Judgment). On February 12, 2008, the Judgment became final. After the Judgment was entered, the Trust's next move would have been to evict the Harydzaks and sell the Property.[10] However, it did not do so because after the Harydzaks filed a Chapter 13 petition (on February 15, 2008) and sued the Defendants, the key principals of New Horizon and the Trust (i.e. Shane

---

[10] The principals of New Horizon and the 1211 Kappa Street Trust, already having pocketed approximately $50,000 from the loan with the Bank [Plaintiffs' Ex. 55C], would have absconded with even more money if they had been able to evict the Harydzaks and then sell the Property.

and Debra Perkins) conveniently disappeared.[11]   Eventually, after the Harydzaks filed their

bankruptcy petition, this Court concluded in a hearing in the main case that it was not bound

by the Judgment and that, therefore, the Harydzaks could remain in possession of the

Property pending disposition of this adversary proceeding.[12]   [Case No. 08-30974, Docket

No. 76.]

20.   On February 15, 2008, the Harydzaks filed a voluntary Chapter 13 petition with this Court.

[Case No. 08-30974, Docket No. 1.]

21.   On February 29, 2008, the Harydzaks filed their Original Complaint (the

Complaint)—initiating this adversary proceeding—alleging, among other things, that the

Bank is not a bona fide lender and, accordingly, holds an unenforceable and void lien on the

Property.  [Docket No. 1.]

---

[11] The record is bare as to where Mr. and Ms. Perkins went.  However, one of Perkins' employees, Derek Farris (formerly the trustee of the Trust [Plaintiffs' Ex. 42]), skipped town to seek other employment in Chicago, Illinois. [Tape recording of Marc Mercer's testimony at the March 4, 2008 hearing at 8:54 a.m. in Case No. 08-30972.]  The other member of New Horizon, Mercer, did not vanish into thin air like Mr. and Ms. Perkins.  He gave testimony at a hearing in the main case.  Although his testimony convinced this Court that he is not a paragon of virtue with respect to his own business practices, it was the husband and wife team of Shane and Debra Perkins who were primarily responsible for using New Horizon and the Trust to fleece homeowners such as the Harydzaks into effectively transferring their homestead equity for the benefit of New Horizon.  The Court can understand why Mr. and Ms. Perkins became scarce after the Harydzaks filed their petition.  And, the Court can also understand why Mr. and Ms. Perkins, on behalf of New Horizon and the Trust, chose not to defend themselves after the Harydzaks filed this adversary proceeding and, instead, allowed the Harydzaks to take a default judgment against them invalidating all of the transactions that the Harydzaks had entered into with these two entities.

[12] One day after the Harydzaks filed their Chapter 13 petition, they filed a pleading entitled "Motion of Debtors for Order that Stay is in Effect as to Residence at 1211 Kappa St., Pasadena Texas, and/or to Determine Validity of Lease, and to Make Other Appropriate Orders" (the Motion).  [Case No. 08-30974, Docket No. 4.]  The Harydzaks filed this Motion in order to obtain this Court's permission to remain in possession of the Property pending their suing the Defendants.  The Court heard testimony at this hearing and granted the Motion.  In its ruling, this Court held that it is not bound by the Judgment because such a judgment awarding possession of the Property to the Trust does not bar a second court—i.e. this Court—from determining issues of title.  The justice court which rendered the Judgment only had jurisdiction to decide the right to immediate possession.  *See* Tex. Gov't Code § 27.031(a) (stating that justice courts have original jurisdiction over a limited number of causes of action, including cases of forcible entry and detainer); *see also* Tex. Gov't Code § 27.031(b)(4) (stating that justice courts lack jurisdiction over suits to try title to land).  Because the title issues raised in this suit were not clearly raised in the justice court, this Court is not precluded from hearing this title dispute on res judicata or collateral estoppel theories and is, therefore, not bound by the Judgment.

22.    On March 3 and 4, 2008, this Court held a hearing in the main case on the Motion. [Case No. 08-30974, Docket No. 4.]   On June 18, 2008, this Court signed an Order keeping the automatic stay in place and allowing the Harydzaks to remain in possession of the Property. [Case No. 08-30974, Docket No. 73.]

23.    On September 3, 2008, the Harydzaks filed the Plaintiffs' Request for Entry of Default, requesting this Court to enter a default judgment in favor of the Harydzaks against New Horizon and the Trust. [Docket No. 17.]

24.    On September 23, 2008, the Bank filed its Amended Answer and Cross Claim. [Docket No. 21.]

25.    On October 14, 2008, the Court signed an Entry of Default in favor of the Harydzaks against New Horizon and the Trust. [Docket No. 26.]

26.    On December 2, 2008, the Harydzaks filed a Motion for Entry of Default Judgment. [Docket No. 30.]

27.    On January 15, 2009, the Court held a hearing on the Harydzaks' Motion for Entry of Default Judgment.

28.    On January 20, 2009, the Court signed an Amended Default Judgment Against New Horizon, LLC and 1211 Kappa Street Trust.  [Docket No. 36.] This default judgment cancelled all transactions between the Harydzaks and New Horizon and the Trust and, as a result, made the Bank the only remaining Defendant in this adversary proceeding.

29.    On January 28, 2009, the Court signed a Default Judgment Against New Horizon, LLC and 1211 Kappa Street Trust awarding the Bank a judgment against New Horizon and the Trust in the amount of $54,531.00. [Docket No. 38.] Therefore, in the wake of these events, the

11

Bank is the only active party defending itself in this suit.   As of the undersigned date, the Bank has not abstracted this judgment.

30.     On February 25, 2009, the Harydzaks and the Bank filed their First Amended Joint Pretrial Statement. [Docket No. 41.][13]  In the First Amended Joint Pretrial Statement and the Bank's proposed findings of fact and conclusions of law, the Bank asserted that (1) it was a bona fide lender when it made the loan to New Horizon, and that, as a bona fide lender, it is entitled to enforce a lien on the Property in the amount of $54,531.06;[14] [Docket No. 41-6, p. 4]; and, in the alternative, (2) it is entitled to subrogation for the amount that its borrower, New Horizon, used from the loan proceeds to pay off the lien held by Regions on the Property.  [Docket No. 41, p. 3.]

31.     In the Harydzaks' proposed findings of fact and conclusions of law attached to the Joint Pretrial Statement, the Harydzaks, through their counsel, concede that based upon the doctrine of equitable subrogation, the Bank is entitled to an equitable lien on the Property to the extent that New Horizon paid off the first lien held by Regions.  [Docket No. 40-4, p. 5.]

32.     On February 26, 2009, this Court held a pre-trial conference.  Plaintiffs' Exhibits 1 through 54 were stipulated to and admitted.

---

[13] The Court notes that the Harydzaks intended to attach to the First Amended Joint Pretrial Statement the same Proposed Findings of Fact and Conclusions of Law which were attached to the initial Joint Pretrial Statement. [Docket No. 40-4.] Instead, the Harydzaks inadvertently attached proposed Findings of Fact and Conclusions of Law relating to a motion in the main case. [Docket No. 41-5.] In the Harydzaks' Post-Trial Brief, the Harydzaks request the Court to treat the initially filed proposed findings of fact and conclusions of law found at Docket Number 40-4 as the intended proposed findings of fact and conclusions of law, and the Court does so.

[14] The correct figure, as noted in Finding of Fact Number 29 and in the Bank's Motion for Entry of Default Judgment against New Horizon and the Trust [Docket No. 34] is $54,531.00—6 cents less than the Bank asserted in its proposed findings of facts and conclusions of law attached to the First Amended Joint Pretrial Statement. [Docket No. 41-6, p. 4.]

33.   On March 5, 2009, this Court held a trial on the Complaint (the March 5 trial) and admitted
Plaintiffs' Exhibits 55A through 55E and 56A through 56AA.

34.   At the March 5 trial, Ms. Harydzak testified about the following matters relating to the
Harydzaks' occupation of the Property prior to and during 2006, when the loan was made by
the Bank: The Harydzaks, their children, and their guests all parked cars in front of the
Property; the Harydzaks' dog barked at a level audible from outside the residence; the
Harydzaks have resided at the Property since June 1982; the Harydzaks and two of their
children were the only ones living at the Property.   Mr. Harydzak also testified about the
following matters regarding the Harydzaks' occupation of the Property:   The Harydzaks
walked their dog on a leash in front of the Property; the Harydzaks worked in the Property's
front yard; and the address listed in the phone book for the Harydzaks was 1211 Kappa
Street, Pasadena, Texas.   The Harydzaks both testified that they believed that they owned
the Property at all times.

35.   At the March 5 trial, Crow, the President of the Bank's Montgomery Banking Center,
testified regarding the Bank's regular business practices.   Crow was responsible for the
approval of the November 7, 2006 loan made to New Horizon which was secured by the
Property.   Crow testified that Plaintiffs' Exhibits 36 through 42 were the documents that
were executed at the closing of the loan with New Horizon.   When asked by Plaintiffs'
counsel whether the Uniform Residential Appraisal Report (the Appraisal Report) [Plaintiff's
Ex. 55A] was in the Bank's file prior to the time of the closing on the loan to New Horizon,
Crow answered, "Not necessarily.   We [i.e. the Bank] sometimes get a verbal figure and
value of opinion [sic] from the appraiser."   Crow further testified, "I can't say for sure if we

[i.e. the Bank] had the document [i.e. the Appraisal Report] when we closed the loan or not, but we probably at least had the value in mind." [Tape recording of March 5 trial at 1:33 p.m.]  Using Crow's deposition from February 12, 2009 to remind Crow of his prior testimony, Plaintiffs' counsel again asked Crow if it was standard operating procedure for the Bank to have the appraisal in its file prior to the loan closing.  Crow confirmed that this is the Bank's standard operating procedure; indeed, he testified that this is a written procedure.  Crow clarified his deposition testimony by saying that although it is the Bank's written procedure for the appraisal report to be in the Bank's file prior to closing on a loan, this procedure is not always followed and that sometimes the loan closing goes forward even if the written appraisal has not been sent to the Bank because the Bank has received the appraiser's verbal opinion on the value of the collateral.  Regarding his review of loan files, Crow testified at trial as follows: "I don't review documents before a loan is closed.  That's a complete different department in a different location." [Tape recording of March 5 trial at 1:40 p.m.]

36.     The Appraisal Report, dated October 17, 2006, listed, among other things, the following: the "Borrower" was "Lydia & David Hegwood," the "Owner of Public Record" was "1211 Kappa Street Trust," and the "Occupant" was the "Owner"—as opposed to the other options listed (i.e. "Tenant" or "Vacant"). [Plaintiffs' Ex. 55A, p. 1.]  The Appraisal Report lists the Property as a single-unit home as opposed to a multi-unit property. [Plaintiffs' Ex. 55A.]  The Appraisal Report also lists the Property at an appraised value of $95,000.00.  [Plaintiffs' Ex. 55A, p. 6.]  The debt the Harydzaks owed to Regions on the original mortgage was

$7,811.83 when the Harydzaks turned to New Horizon. Therefore, there was a substantial amount of equity in the Property.

37. The Real Estate Loan to Value Summary, signed by the Bank on November 1, 2006, shows that the loan amount is 60% of the appraised value of the Property and that the loan to appraised value meets the Bank's requirements for a prudent loan. [Plaintiffs' Ex. 55E.] On November 1, 2006, Bank's outside counsel, who drafted the loan documents for the New Horizon loan, sent these loan documents to Alamo Title Company (Alamo Title) with instructions to ensure that all of the documents that he drafted were executed by the appropriate parties. [Plaintiffs' Ex. 55D.]

38. On November 7, 2006 (i.e. the date of the loan closing), Perkins and Marc A. Mercer, the Managers of New Horizon, signed the U.S. Department of Housing and Urban Development Settlement Statement (the HUD-1 Settlement Statement). [Plaintiffs' Ex. 55C.] The HUD-1 Settlement Statement shows that: (1) New Horizon received $50,590.73 as a cash settlement; (2) Alamo Title was the Settlement Agent; (3) the Bank was the lender; and (4) there was no information set forth in the box marked "Name of Seller."

39. Alamo Title served as the title insurer and escrow agent for this loan transaction. Alamo Title's loan closing file, in part, is reproduced as Plaintiffs' Exhibits 56A through 56AA. Alamo Title's closing file contained the Regions mortgage pay-off statement, which is a screen shot of the mortgage loan history with Regions showing "Primary Borrower: THEODORE HARYDZAK." [Plaintiffs' Ex. 56AA.] Additionally, the "11/7/2006" printed in the bottom right-hand corner indicates that this pay-off statement was printed on November 7, 2006. [Plaintiffs' Ex. 56AA.]

40.     On May 3, 1982, Debra L. Bowling, the previous owner of the Property, deeded the Property to the Harydzaks as shown in the Warranty Deed with Vendor's Lien [Plaintiffs' Ex. 56D] which was part of Alamo Title's closing file.

### III. CREDIBILITY OF WITNESSES

At the trial held on March 5, 2009, the Court heard testimony from Jo Lane Harydzak, Theodore Harydzak, and James E. Crow, Jr. The Court finds all of these witnesses to be credible.

### IV. CONCLUSIONS OF LAW

**A. Jurisdiction and Venue**

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This particular dispute is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), and (K). Venue is proper pursuant to 28 U.S.C. § 1409.

**B. The Bank is not a bona fide lender.**

In determining whether to give effect to the Deed of Trust held by the Bank for the loan that it made to New Horizon, the key issue before this Court is whether the Bank was a bona fide lender when it made the loan to New Horizon.

In the Complaint, the Harydzaks seek a declaration that the Bank is not a bona fide lender. [Finding of Fact No. 21.] In the First Amended Joint Pretrial Statement, the Bank asserts that it was a bona fide lender when it made the loan to New Horizon. [Finding of Fact No. 30.] Further, the Bank contends that as a bona fide lender, it is entitled to enforce its rights (including foreclosure) pursuant to the Deed of Trust lien that it holds. [Finding of Fact No. 30.] Specifically, the Bank

16

asserts that it holds a lien under the Deed of Trust in the amount of $54,531.00—which is the amount of the judgment awarded to the Bank against New Horizon and the Trust. [Finding of Fact No. 29.][15]

"Status as a bona fide purchaser is an affirmative defense to a title dispute." *Madison v. Gordon*, 39 S.W.3d 604, 606 (Tex. 2001). Although bona fide purchaser status is an affirmative defense, the parties claiming title (i.e. the Harydzaks) have the burden to prove that a subsequent purchaser or lender is not a bona fide purchaser or lender. *Amason v. Woodman*, 498 S.W.2d 142, 143-44 (Tex. 1973); *Clark v. Snider*, 738 S.W.2d 49, 52 (Tex. App.—Texarkana 1987, no writ) (citing *Westland Oil Dev. Corp. v. Gulf Oil*, 637 S.W.2d 903, 907 (Tex. 1982)). Under Texas Law, to be a bona fide purchaser—or, as in this suit, a bona fide lender—three elements must be satisfied: The lender must have obtained an interest in the property (1) in good faith, (2) for value, and (3) without notice of any third party claim or interest. *World Sav. Bank, F.S.B. v. Gantt*, 246 S.W.3d 299, 306 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (citing *Houston First Am. Sav.*, 650 S.W.2d at 769).

### 1. The Bank obtained an interest in the Property in good faith.

Good faith is defined as the "observance of reasonable commercial standards of fair dealing in a given trade or business." Black's Law Dictionary 701 (7th ed. 1999). In the context of a bona

---

[15] Even though the Bank has taken a judgment against its borrower, New Horizon, the existence of that judgment does not bar the Bank from enforcing whatever rights, if any, it has under the Deed of Trust. When the Bank sued New Horizon, it did not seek a judicial foreclosure, and therefore, having not elected to pursue judicial foreclosure, still has the right to pursue non-judicial foreclosure pursuant to the Deed of Trust. *See In re Gayle*, 189 B.R. 914 (Bankr. S.D. Tex. 1995) (holding that the doctrine of election of remedies does not bar a lender from seeking to hold a non-judicial foreclosure even though the lender obtained a judgment on the promissory note secured by the deed of trust when the lender, in the lawsuit, sought a judgment only for the amount owed under the note and not for judicial foreclosure). In the suit at bar, the Bank's judgment against New Horizon and the Trust is not abstracted [Finding of Fact No. 29], and therefore the only avenue at this point for the Bank to foreclose would be through a non-judicial foreclosure sale under the Deed of Trust that New Horizon executed and delivered to the Bank.

fide purchaser, Texas law[16] is unclear on what constitutes "good faith." *Cohen v. Hawkins*, No. 14-07-00043-CV, 2008 WL 1723234, at *5 (Tex. App.—Houston [14th Dist.] Apr. 15, 2008, no pet.) (discussing the various general definitions of "good faith" under Texas law). The Texas Supreme Court has reviewed definitions of "good faith" in various contexts and has concluded that "good faith" refers to "conduct which is honest in fact, free of improper motive or willful ignorance of the facts at hand." *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285 (Tex. 1998). The rebuttable presumption under Texas law is that business transactions are performed in good faith and for an honest purpose. *Canfield v. Bank One, Tex., N.A.*, 51 S.W.3d 828, 837 (Tex. App.—Texarkana 2001, no pet.).

Here, the Harydzaks did not tender direct evidence to prove that the Bank, in making the loan to New Horizon, was somehow acting in bad faith or with a dishonest purpose. Indeed, the $57,000.00 loan to New Horizon was 60% of the value of the Property (i.e. the appraised value of the house is $95,000.00 [Findings of Fact Nos. 36 & 37], and 60% of that value is $57,000.00). A loan for an amount substantially less than the value of the collateral is a very prudent loan.[17] Moreover, the Bank had previously extended other loans to New Horizon, and New Horizon had repaid those loans. [Finding of Fact No. 13.] Hence, there was a pattern of successful past dealings between the Bank and New Horizon. In this Court's view, a well-collateralized loan made to an existing borrower with a successful track record of repaying its obligations constitutes a loan

---

[16] Texas law applies here pursuant to Federal Rule of Evidence 302 which states: "In civil actions and proceedings, the effect of a presumption respecting a fact which is an element of a claim or defense as to which State law supplies the rule of decision is determined in accordance with State law." Fed. R. Evid. 302.

[17] According to the Bank's Real Estate Loan to Value Summary, a loan to appraised value of 60% complies with the Bank's standard for a prudent loan. [Finding of Fact No. 37.]

transaction made in good faith and for an honest purpose. Accordingly, the good faith element is satisfied.

### 2. The Bank obtained an interest in the Property for value.

The Harydzaks' counsel stipulated that the Bank gave value to New Horizon. [Finding of Fact No. 12.] Indeed, the value element is satisfied because the Bank gave value in exchange for receiving a deed of trust from New Horizon. "Value" means the "monetary worth or price of something." Black's Law Dictionary 1549 (7th ed. 1999). The Bank made a $57,000.00 loan to New Horizon in exchange for a security interest in the Property as collateral for the loan. [Finding of Fact No. 12.] There is no question that the value element is satisfied, and the Harydzaks' counsel was right to stipulate to this element.

### 3. The Bank had notice of a third party claim or interest.

The third and final element for the bona fide lender test is whether the Bank made the loan without notice of any third party claim or interest. "Notice will defeat the protection otherwise afforded a bona fide purchaser." *Fletcher v. Minton*, 217 S.W.3d 755, 758 (Tex. App.—Dallas 2007, no pet.). A lender may have notice in one of two ways: actual notice or constructive notice. *Flack v. First Nat'l Bank*, 226 S.W.2d 628, 631 (Tex. 1950). The Court will discuss each in turn.

### a. The Bank had actual notice of the Harydzaks' interest in the Property.

Under Texas law, "[a]ctual notice results from personal information or knowledge, as well as those facts which reasonable inquiry would have disclosed." *Fletcher*, 217 S.W.3d at 758; *see also City of Richland Hills v. Bertelsen*, 724 S.W.2d 428, 430 (Tex. App.—Fort Worth 1987, no writ) (defining actual notice as "when a person actually knows the facts charged to him, or should have known them if he had inquired about them, after learning of facts which put him on inquiry").

Additionally, the Fifth Circuit, applying Texas law, has provided the following explanation of actual notice: "[W]hatever fairly puts a person on inquiry is sufficient notice, where the means of knowledge are at hand, which if pursued by the proper inquiry the full truth might have been ascertained." *E.D. Sys. Corp. v. Southwestern Bell Telephone Co.*, 674 F.2d 453, 459 (5th Cir. 1982) (quoting *Hexter v. Pratt*, 10 S.W.2d 692, 693 (Tex. Comm'n. App. 1928) (cited with approval in *Woodward v. Ortiz*, 237 S.W.2d 286, 289 (Tex. 1951))).  While it may seem counterintuitive to charge the Bank with actual notice of facts that it should have, but did not, discover, "[w]here one has the duty of making such investigation the careless disregard or ignorance of the facts which such an investigation would have revealed has an effect under the law equal in all respects to actual knowledge." *Farmers Mut. Royalty Syndicate, Inc. v. Isaacks*, 138 S.W.2d 228, 231 (Tex. Civ. App.—Amarillo 1940, no writ).  Thus, the test for actual notice is whether the Bank knew or had facts available such that it should have known of the Harydzaks' claim of a homestead interest in the Property. *Laws v. Baily*, No. 14-01-00108, 2002 WL 31318207, at *8 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

One of the relevant facts for determining if the Bank had actual notice of the Harydzaks' homestead claim in the Property is whether the Appraisal Report was in the Bank's file at the time the Bank made the loan.  At the March 5 trial, Crow testified that he could not answer definitively whether or not the Appraisal Report was in the Bank's set of documents at the time the Bank made the loan to New Horizon. [Finding of Fact No. 35.]  Crow testified that the Bank had previously closed loans using only a verbal figure from the appraiser; however, Crow admitted that the Bank's written standard operating procedure requires that appraisal reports actually be in the loan file at the time of the closing.  [Finding of Fact No. 35.]  Therefore, the Court proceeds with this portion of its

20

analysis assuming that the Bank followed its standard procedures and that the Appraisal Report was in the Bank's file at the time the loan was made to New Horizon.

Assuming this Appraisal Report was in the Bank's file at the time the loan to New Horizon was made, the Bank would have seen numerous red flags.  For example, on the line item "Borrower," the Appraisal Report listed "Lydia & David Hegwood," [Finding of Fact No. 36], two individuals who were not the borrowers in the subject loan transaction, who never resided at the Property, who were not in the chain of title, and whose names were unfamiliar to the parties, most notably the Bank.[18] These circumstances should have caused the Bank immediate concern, or at least prompted the Bank, at a minimum, to ask the appraiser the following questions: (1) Why is New Horizon not listed as the borrower?; (2) Who are Lydia and David Hegwood, and are they residing at the Property?; (3) If they are residing there, are they claiming the Property as homestead?; and (4) If they are not, who is and what status do they assert?  If the Bank had asked these questions, it would have necessarily discovered that the Harydzaks resided at the Property and were claiming it as homestead.

Additionally, the Appraisal Report listed "1211 Kappa Street Trust" as the "Owner of Public Record."  If the borrower was New Horizon and also the party which would be executing the Deed of Trust, and yet title to the real property was in the name of the Trust, the Bank should have asked the appraiser what the Trust was and whether the trustee of that trust was occupying the Property and, if so, whether the trustee was claiming a homestead interest in the Property.

---

[18] At the March 5 trial, the Bank conceded that it did not know who Lydia and David Hegwood were.  [Tape recording of March 5 trial at 3:15 p.m.]

Finally, on the Appraisal Report, the line item for "Occupant" had the "Owner" box checked as opposed to either of the other two boxes—"Tenant" or "Vacant." Thus, according to the Appraisal Report, the Trust was the occupant. Once again, this red flag should have caused the Bank to ask the appraiser who was actually residing on the Property: the trustee of the trust or some other individual asserting a homestead claim. It was unreasonable for the Bank to make no inquiries when its own appraiser's written report suggested that there was more than one person or entity holding an interest in the Property. The Bank therefore had facts in its possession whereby the Bank should be held to have actual knowledge that the Property was being claimed as a homestead.

In the alternative, even if the Court is incorrect in its presumption that the Appraisal Report was in the Bank's loan file pursuant to its standard operating procedures, the Bank had actual notice from other facts which, after reasonable inquiry, would have disclosed that the Harydzaks were claiming the Property as their homestead.

For example, the Bank knew on or before the closing that because the Trust deeded the Property to New Horizon on November 7, 2006, New Horizon did not have title to the Property until the day of closing (i.e. November 7, 2006). [Finding of Fact No. 11.] Given this knowledge, it was only reasonable for the Bank to inquire who was residing on the Property: the trustee of the trust or someone else, and, in either case, whether the person or persons residing there were claiming the Property as homestead.

Additionally, the Bank should have inquired about the Harydzaks' interest in the Property because it needed the Harydzaks and the other beneficiaries of the Trust to sign the Consent by Beneficiaries. [Finding of Fact No. 14.] The Consent by Beneficiaries, drafted by the Bank's attorney for this particular loan transaction and included in the loan file, is not a routine form

document that is typically signed at a loan closing on residential property.[19]   Because the Bank's

attorney took it upon himself to prepare it, the Bank should have asked additional questions about

the necessity of such a document and why the Harydzaks had to sign this document in addition to

New Horizon executing it.   Further, as of the date of the loan, the Harydzaks had not signed the

Consent by Beneficiaries.  [Finding of Fact No. 10.]  It was not until November 8, 2006—the day

*after* the loan was made—that the Harydzaks signed the Consent by Beneficiaries. [Finding of Fact

No. 14.]  This is further evidence of the Bank's lack of diligence in this particular loan transaction

with New Horizon.  If the Bank had made timely inquiries, even minimal probing would likely have

uncovered that the Harydzaks had been residing on the Property for 25 years and claimed it as

homestead.   Thus, once again, based on the facts at its disposal, the Bank should be held to have

actual notice of the Harydzaks' homestead claim.

In addition, the HUD-1 Settlement Statement lacks any information in the "Name of Seller"

box. [Finding of Fact No. 38.]  The absence of this information reflects that no sale of the Property

occurred; rather, this was a non-purchase money loan secured by real property.[20]   If the Trust

transferred title to the Property to New Horizon on the day of the closing [Finding of Fact No. 11],

then the Bank should have known that some party other than the borrower, New Horizon, had held

title to the Property.  Prudent lending practices would have led the Bank to discover that the Property

_____

[19] The Consent by Beneficiaries reads as follows: "The undersigned [i.e. the Harydzaks and New Horizon], being all of the beneficiaries of the 1211 Kappa Street Trust, hereby agree and consent to the execution and delivery of that certain Special Warranty Deed dated November 7, 2006, executed by 1211 Kappa Street Trust, as Grantor, and New Horizon, LLC, Grantee." [Finding of Fact No. 14.] Any prudent lender would inquire what interest the signatories of this document might be claiming in the Property.  Because the Bank's attorney put signature lines for the Harydzaks on this document, the Bank should have inquired who the Harydzaks were and what interest they might be claiming in the Property.

[20] *See infra* Part IV.B.3.b for a discussion of how non-purchase money liens on homestead property are void under section 50 article 16 of the Texas Constitution.

23

was being claimed as a homestead, but the Bank failed to conduct any reasonable inquiry, despite the facts at its disposal prior to making the loan.

Further, Alamo Title[21], as the Bank's escrow agent, had a duty to make full disclosures to its principal, the Bank. *Watkins v. Williamson*, 869 S.W.2d 383, 387 (Tex. App.—Dallas 1993, no writ) (an escrow agent owes fiduciary duties to both parties to the underlying contract, including the duty of loyalty, the duty to make full disclosure, and the duty to exercise a high degree of care to conserve the money and pay it only to those persons entitled to receive it). An agent's knowledge may be imputed to the principal. *Fletcher*, 217 S.W.3d at 759; *Poth v. Small, Craig, & Werkenthin, L.L.P.*, 967 S.W.2d 511, 515 (Tex. App.—Austin 1998, pet. denied); *Williams v. Jennings*, 755 S.W.2d 874, 883 (Tex. App.—Houston [14th Dist.] 1988, writ denied) ("If an agent's acts are within the scope of his authority and are related to matters over which such authority extends, notice to the agent is then deemed to be notice to the principal."). As the Bank's agent, any knowledge that Alamo Title had regarding the Bank's loan transaction with the Harydzaks is imputed to the Bank. Alamo Title, while acting within the scope of its duties as an escrow agent for the Bank, acquired a mortgage pay-off statement from the prior lienholder, Regions. [Finding of Fact No. 39.] This mortgage pay-off statement is a screen shot of the mortgage loan history with Regions, and it shows the following information: "Primary Borrower: THEODORE HARYDZAK." [Finding of Fact No. 39.] Therefore, Alamo Title's knowledge that the mortgage with Regions Bank had to be paid off by Theodore Harydzak, as shown in Plaintiffs' Exhibit 56AA, is imputed to the Bank. Because the

---

[21]Alamo Title served as a title insurer for the Bank as well as an escrow agent for both the Bank and New Horizon. Alamo Title also served as a settlement agent. [Finding of Fact No. 38.]

existing mortgage was in the Harydzaks' name on November 7, 2006,[22] the Bank should have discovered that the Harydzaks' interest in the Property. Again, the Bank could have discovered that the Property was being claimed as homestead, but it failed to do so.

Moreover, because Alamo Title's knowledge of documents in its closing file is imputed to the Bank, *Poth*, 967 S.W.2d at 515, the Bank also had notice of the May 3, 1982 Warranty Deed with Vendor's Lien in Alamo Title's closing file. Debra L. Bowling, the previous owner of the Property, executed this deed granting title in the Property to the Harydzaks. [Finding of Fact No. 40.] Thus, at the time the Bank made the loan in 2006, there was documentation available to the Bank reflecting—or at least suggesting—that the Harydzaks had been residing at the Property for nearly 25 years (i.e. from 1982 to 2006). Under these circumstances, the Bank should have inquired about the Harydzaks' interest in the Property and whether they claimed the Property as their homestead. However, the Bank did not make any inquiry—reasonable or even perfunctory.

Finally, it was the Bank's outside counsel who drafted the loan documents for the New Horizon loan and sent these documents to Alamo Title on November 1, 2006 with instructions to ensure that all of the documents that he drafted were executed by the appropriate parties. [Finding of Fact No. 37.] In order to properly draft these loan documents to include all the appropriate parties, the Bank's attorney necessarily had to review a slew of existing documents. For example, he reviewed the Trust Agreement [Plaintiffs' Ex. 23], which set forth that the Harydzaks had a 97% beneficial interest in the Trust—i.e. in the entity that held title to the Property just prior to the closing. There is no question that this attorney noticed the beneficial interest held by the Harydzaks.

---

[22] In the bottom right hand corner of Plaintiffs' Exhibit 56AA, "11/7/2006" is printed indicating that this pay-off statement was printed was on November 7, 2006—the day of the loan closing—and the borrower's name was listed as Theodore Harydzak. [Finding of Fact No. 39.]

25

Indeed, why else would the Bank's counsel have drafted the document entitled "Consent by Beneficiaries"—by no means a run-of-the-mill loan closing document—which expressly obtained the consent of the Harydzaks to the conveyance of the Property from the Trust to New Horizon? [Finding of Fact No. 14.] Counsel assuredly drafted this document because he wanted to make sure that anyone who had any interest in the Property consented to the conveyance of title from the Trust to New Horizon. Therefore, the Bank's attorney had knowledge that the Harydzaks had an interest in the Property.

The Bank's attorney is the Bank's agent because "[a]n attorney-client relationship is an agency relationship." *Wash. Mut. Bank v. Heard (In re Heard)*, No.07-03444, 2008 WL 5479099, at *4 (Bankr. S.D. Tex. Nov. 25, 2008) (citing *Link v. Wabash R. Co.*, 370 U.S. 626, 633-34 (1962)); *Gavenda v. Strata Energy, Inc.*, 705 S.W.2d 690, 693 (Tex. 1986) ("The attorney-client relationship is an agency relationship.") Under Texas law, "'[k]nowledge acquired by an attorney during the existence of an attorney client relationship, and while acting in the scope of his or her authority, is imputed to the client.'" *In re Villarreal*, No. 08-70002, 2009 WL 262917, at *10 (Bankr. S.D. Tex. Feb. 3, 2009) (quoting *McMahan v. Greenwood*, 108 S.W.3d 467, 480-81 (Tex. App.—Houston [14th Dist.] 2003, pet. denied)); *In re Ginther Trusts*, No. 06-3556, 2006 WL 3805670, at *6 (Bankr. S.D. Tex. Dec. 22, 2006) (citing *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 584 (Tex. 2006) (stating that "in the context of an enduring attorney-client relationship, knowledge acquired by the attorney is imputed to the client.") (citation omitted)). Therefore, any knowledge the Bank's attorney had about the Harydzaks' interest in the Property is imputed to the Bank. No prudent lender would extend financing without inquiring just exactly what type of beneficial interest the Harydzaks

26

had in the Property, whether they were residing on the Property, and whether they claimed the Property as homestead.

Accordingly, the Bank had actual notice because it had ample facts at its disposal that, after even the most minimal due diligence, would have revealed that the Harydzaks were claiming the Property as their homestead.  Thus, based on the facts at its disposal, the Bank had actual notice of the Harydzaks' interest in the Property.

### b. The Bank had constructive notice of the Harydzaks' interest in the Property.

"Constructive notice is notice the law imputes to a person not having personal information and knowledge." *Madison*, 39 S.W.3d at 606.  The implied notice doctrine applies if the lender had a duty to ascertain the rights of a third-party possessor. *See id*.  "The 'duty to ascertain the rights of a third-party possessor' arises only 'if the possession is visible, open, exclusive, and unequivocal.'" *Morgan v. Chase Home Finance, LLC*, No. 08-50288, 2008 WL 5422863, at *5 (5th Cir. Dec. 31, 2008) (quoting *Madison*, 39 S.W.3d at 606).  Possession that meets these  requirements affords notice of title equivalent to that constructive notice that the deed registration affords. *Madison*, 39 S.W.3d at 606 (citing *Strong v. Strong*, 98 S.W.2d 346, 348 (Tex. 1936)).  Thus, if the Harydzaks can show such possession, the Bank is charged with constructive notice of their claims that the Bank might have reasonably discovered on proper inquiry. *Id*.

The first requirement—visible and open possession—is met here. As the Harydzaks testified, members of the Harydzak family and their guests parked cars in front of the Property. [Finding of Fact No. 34.]  Additionally, the family dog's bark was audible from the street, and the Harydzaks walked their dog on a leash in front of the Property. [Finding of Fact No. 34.] The Harydzaks also worked in the Property's front yard. [Finding of Fact No. 34.]  The Harydzaks received their mail

at the mailbox at the front of the Property, and the address listed in the phone book for the Harydzaks was 1211 Kappa Street, the Property's address. [Finding of Fact No. 34.] Accordingly, the Harydzaks' possession was visible and open.

The second requirement—exclusive possession—is also met here.  Unlike the tenant in *Madison* who was one of four tenants living in a multi-unit structure, the Harydzaks and two of their children were the only residents of the Property in 2006 when the Bank made the loan. [Finding of Fact No. 34.]  The Harydzak family—and only the Harydzak family—has occupied the Property since June 1982 to the present. [Finding of Fact No. 34.]  The Appraisal Report (assuming it was included in the loan file pursuant to the Bank's standard operating procedures) reflects that the Property is a single-unit home as opposed to a multi-unit property.  [Finding of Fact No. 36.] This fact puts the Bank on notice that one family or individual lived at the Property and had been residing there for nearly a quarter of a century.  Thus, the Harydzaks' possession was exclusive.

The third requirement—unequivocal possession—is met here.  "'[W]hen an occupant's possession is compatible with another's ownership assertion, the occupant's possession cannot be said to be unequivocal.'"  *Morgan v. Chase Home Fin., LLC*, No. 08-50288, 2008 WL 5422863, at *5 (5th Cir. Dec. 31, 2008) (quoting *Madison*, 39 S.W.3d at 607).  Unlike the tenant in the *Madison* case whose occupancy was compatible with the unit's owner, the Harydzaks were not mere tenants beholden to a landlord.  Their possession was unambiguous and not subservient or attributable to another owner. *See Strong*, 98 S.W.2d at 350.  Indeed, the Harydzaks were not mere tenants because the title records revealed that the Trust had title up until the loan closing and that the Harydzaks were majority beneficiaries of this trust. [Finding of Fact No. 7.]  Further, at the instruction of the Bank's counsel, together with prodding from the Managers of New Horizon, the Harydzaks signed a

28

Consent by Beneficiaries. [Finding of Fact No. 14.]  This language indicates that the Harydzaks were more than mere tenants.  Indeed, Crow's testimony at the March 5 trial confirms the Court's conclusion:

> Plaintiffs' counsel:  "Given the fact that the Harydzaks lived in the Property located at 1211 Kappa Street in Pasadena, and that they were listed as beneficiaries of the trust that held title, wouldn't it appear that the Harydzaks were something more than tenants of New Horizon at that time?"
>
> Crow:  "Yes."

[Tape recording of March 5 trial at 1:55 p.m.]  Accordingly, by its own admission, the Bank knew that the Harydzaks were not mere tenants.  This should have prompted the Bank to make further inquiries, which would likely have led the Bank to facts indicating that the Harydzaks' possession was not subservient to another owner and therefore unequivocal.

Because the Harydzaks' possession was visible, open, exclusive, and unequivocal, the Bank had constructive notice of their possession of the Property.  And, because the Bank had this notice, the Bank had a duty to ascertain the rights of the Harydzaks.  Consequently, the Bank is charged with notice of the Harydzaks' homestead claim which it would likely have discovered on reasonable inquiry.  And, had the Bank made such inquiry, it would have discovered that the Harydzaks had been residing on the Property since 1982 and that they had claimed it as their homestead since that date.  All of these facts would have caused the Bank, or any prudent lender, to refrain from making the loan to New Horizon because, as any lender knows, "Article 16, section 50(a) of the Texas constitution provides that the homestead of a family is protected from forced sale or the payment of debts except for certain enumerated encumbrances." *Parks v. Buckeye Retirement Co., L.L.C.*, No. H-05-3524, 2006 WL 1662945, at *3 (S.D. Tex. June 9, 2006) (citing Tex. Const. art. 16, § 50).

And, as any lender knows, the only valid encumbrances are purchase money liens, tax liens, mechanics liens, and home equity liens—none of which apply in the suit at bar. *See, e.g., In re Pfeil*, No. 07-51241-C, 2007 WL 2034295, at *1-2 (Bankr. W.D. Tex. 2007); *Stephens v. Federal Deposit Ins. Corp. (In re Stephens)*, 149 B.R. 414, 416 n.1, 419 (Bankr. E.D. Tex. 1992) (citing Tex. Const. art. 16, § 50) (holding that where the debtor's residence on property was unambiguous, the non-purchase money lien on the debtor's homestead property was void under the Texas Constitution).

In sum, the Bank is not a bona fide lender because only two of the three elements of the bona fide lender test are met: Although the Bank may have made the loan in good faith and for value, the Bank had notice of the Harydzaks' interest in the Property.

## C.  The Bank is entitled to an equitable subrogation claim.

Although the Bank is not entitled to a valid and enforceable lien on the Property for the loan made to New Horizon on November 7, 2006, the Bank is entitled to an equitable subrogation claim. "The [equitable subrogation] doctrine  allows a third party who discharges a lien upon the property of another to step into the original lienholder's shoes and assume the lienholder's right to the security interest against the debtor.  The doctrine of equitable subrogation has been repeatedly applied to preserve lien rights on homestead property." *LaSalle Bank Nat. Ass'n v. White*, 246 S.W.3d 616, 618-19 (Tex. 2007) (internal citations omitted).  Further, the "invalidation of a contractual lien does not preclude equitable subrogation." *Id.* at 620.  "In *Texas Land & Loan Co. v. Blalock*, [the Texas Supreme Court] held that, although a home-equity loan was invalid under the Texas Constitution, the lender was entitled to equitable subrogation to the extent of the prior valid purchase-money lien that the loan had been used to discharge." *Id.* (citing *Tex. Land & Loan Co. v. Blalock*, 13 S.W. 12, 13-14 (Tex. 1890)).

In the suit at bar, New Horizon used $4,232.62 of the $57,000.00 loan from the Bank to pay off the lien on the Property held by Regions. [Finding of Fact No. 12.] But for the Bank's loan to New Horizon, the Regions lien would not have been retired—an event which clearly benefitted the Harydzaks. Under these circumstances, the Bank is entitled to a lien on the Property in the amount of $4,232.62.[23]

## V. Conclusion

For the reasons stated herein, the Court concludes that the Bank is not a bona fide lender. Further, because the Bank is not a bona fide lender, the Court concludes that the Bank does not have a valid and enforceable lien on the Property under the Deed of Trust associated with its November 7, 2006 loan to New Horizon. However, based on the doctrine of equitable subrogation, the Court concludes the Bank is entitled to a lien on the Property of $4,232.62—representing the amount which New Horizon paid to Regions using funds from the Bank's loan. After all is said and done, the result is that the Bank must absorb a loss on its books for much of the $57,000.00 loan that it extended to New Horizon. That is the price the Bank pays for doing business with likes of Shane and Debra Perkins and, additionally, for failing to do even a modicum of due diligence about whether the Harydzaks claimed the Property as homestead. At trial, Crow, the Bank's president, testified: "I don't review documents before a loan is closed. That's a complete different department in a

---

[23] In the Harydzaks' proposed findings of fact and conclusions of law attached to the Joint Pretrial Statement, counsel for the Harydzaks has set forth that based on the doctrine of equitable subrogation, the Bank is entitled to stand in the shoes of Regions and receive a lien on the Property to secure a purchase-money debt of $12,044.45. Counsel referenced this figure of $12,044.45 by noting that it is the sum of $7,811.83, which New Horizon paid to Regions *prior* to obtaining the loan from the Bank, plus $4,232.62, which New Horizon paid to Regions *after* obtaining the loan from the Bank. However, granting the Bank an equitable lien on the Property in the amount of $12,044.45 is not justified under the law. The $7,811.83 which New Horizon paid to Regions came from funds other than the proceeds of the Bank's loan. [Finding of Fact No. 6.] Therefore, at most, the Bank is entitled to an equitable lien on the Property for $4,232.62, as New Horizon used only $4,232.62 of the $57,000.00 loan proceeds from the Bank to pay off Regions.

different location." [Finding of Fact No. 35.]  Given his many years of experience, had he reviewed the Appraisal Report and the loan documents drafted by the Bank's own counsel, he might have—indeed, should have—seen enough red flags to investigate who was residing at the Property and whether they claimed it as homestead.  Crow would do well to take the time to review future appraisals and loan documents prior to the loan closing taking place on loans that he has approved.

A judgment consistent with this Memorandum Opinion will be entered on the docket simultaneously with the entry of this Memorandum Opinion.


Signed on this 23rd day of April, 2009.

Jeff Bohm
United States Bankruptcy Judge